**STATE of Iowa, Appellee,**

v.

**Marion Edward WILLIAMS, Appellant.**

**No. 53405.**

Supreme Court of Iowa.

Oct. 14, 1969.

Rehearing Denied Dec. 8, 1969.

Rockwell & Jones, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Larry Seckington, Asst. Atty. Gen., and Ray Fenton, County Atty., for appellee.

MOORE, Justice.

June 5, 1968 the Polk County grand jury returned an indictment charging Marion Edward Williams, a licensed pharmacist, with failure to keep proper records of narcotic drugs in violation of section 204.9, Code, 1966, to which, after an adverse ruling on his motion to quash or set aside the indictment, he entered a plea of not guilty. On trial a jury verdict of guilty was returned. October 14, 1968 the trial court entered judgment fining defendant $2000 and sentencing him to serve two years in the state penitentiary at Fort Madison. Defendant has appealed. We affirm.

Defendant asserts the trial court erred in (1) overruling his motion to quash indictment, (2) allowing the witness Raaz to testify regarding the accountability survey, (3) allowing exhibit 1 in evidence, (4) permitting the witness Crews to testify as to the law, (5) overruling his motion for directed verdict at the close of the State's evidence, (6) overruling his motion for directed verdict at close of all the evidence, (7) overruling his motion for judgment notwithstanding the verdict or new trial, (8) submitting instructions 4 and 5 and (9) imposing the sentence which was imposed upon him.

Section 204.19, Code, 1966, makes it the duty of the board of pharmacy examiners, all peace officers and county attorneys to enforce all provisions of the Uniform Narcotic Drug Act, chapter 204, Code, 1966.

January 4, 1967 Virgil A. Raaz and Clifford Wheeler, state pharmacy board inspectors, made an audit of Williams Prescription Pharmacy at 1103 University Ave. in Des Moines. On arrival they announced to defendant, owner and operator of the pharmacy, they were there to conduct a class 'X' narcotics audit. They told defendant they wanted his exempt registry signature book and all invoices covering the same items and they would physically count the on-hand individual items.

The audit, which is also referred to in the record as an accountability survey, covered four-ounce Robitussin A–C (the C refers to codeine) and four-ounce Elixir Terpin Hydrate and Codeine for the period from July 1 to December 31, 1966. The only invoices produced by defendant of purchases of these two items were those from Des Moines Drug Company. They showed purchases on various dates between July 1 and December 31, 1966 totaling 2328 four-ounce bottles Robitussin A–C and 66 four-ounce bottles Elixir Terpin Hydrate and Codeine. The registry book showed sales of 1961 four-ounce bottles of Robitussin A–C and no sales of Elixir Terpin Hydrate and Codeine. After counting the stock on hand the inspectors prepared and made a part of the pharmacy board's records an audit report which is now exhibit 1 in the record.

As a follow-up on this audit or accountability survey Mr. Raaz checked invoices at Des Moines Drug and Iowa Drug Company in Des Moines for sale of the two items to defendant during the six months period being investigated. He found at Des Moines Drug invoices dated 7–19–66, 7–22–66, 7–26–66, 7–28–66, 7–29–66, 11–18–66, 11–22–66, 11–23–66, 11–28–66, 11–30–66, 12–2–66, 12–6–66, 12–7–66, 12–13–66, 12–16–66, 12–19–66, 12–21–66, 12–23–66, 12–29–66, showing sales to defendant of 546 bottles of Robitussin A–C, making a total of 2874. None of these invoices were shown to the inspectors by defendant. Nine of them showed purchases of Elixir Terpin Hydrate and Codeine. The record discloses defendant paid cash for these purchases within two or three days after

delivery. They totaled several hundred dollars.

Investigation at the Iowa Drug disclosed 29 invoices and defendant had purchased 1392 four-ounce bottles of Robitussin A–C during the six months period involved. He had produced none of these invoices when the inspectors requested all his invoices.

Thearl Mesecher, accountant for Des Moines Drug Company, identified the above listed invoices as part of the company's regular business records and testified the drugs listed thereon had been paid for by defendant. Evidence of defendant's purchase of the 1392 four-ounce bottles of Robitussin A–C at the Iowa Drug Company was initially introduced and fully developed on cross-examination of State's witness Raaz.

Class 'X' narcotics is a federal classification of narcotic preparations which do not require a prescription to make a purchase thereof. The record, however, establishes federal regulations require a pharmacist keep a record of those to whom Class 'X' narcotics are sold.

Paul Crews, secretary to the board of pharmacy examiners and director of the narcotic division, a registered pharmacist since 1939, testified: "A class 'X' narcotic contains a narcotic medication within certain limitations of amounts, and also in combination with other drugs and medicine which are not narcotic. Neither Elixir Terpin Hydrate and Codeine or Robitussin A–C contains more than one grain of Codeine per fluid ounce. Codeine is a narcotic drug derived from the parent material gum opium. * * * Codeine is derived from this morphine base and codeine is classified as a narcotic drug. The usual dosage of Codeine depending upon the condition it is prescribed for, for an average adult, probably would be a fourth of a grain, and a physician may prescribe two, three, maybe up to a maximum of four doses a day for a short period of time, depending upon the

existing condition. Robitussin A–C and Elixir Terpin Hydrate and Codeine contain either sixteen or eight times the normal dosage per four ounce bottle."

On cross-examination by defendant's counsel Crews testified Class 'X' narcotics, one of which is Robitussin A–C, is exempt from prescription requirements but not exempt from other requirements. On redirect examination, over defendant's objection, Crews testified Robitussin A–C is exempt from prescription requirements under the Iowa law but all record keeping requirements must be maintained as to receipt of the drug at the time of purchase and at the time of the sale of the drug. He stated further the board had not as of 1966 adopted additional rules or instructions on record keeping requirements.

█ I. The main thrust of defendant's argument that the trial court erred in overruling his motion to quash, his motions for directed verdict, his motion for judgment notwithstanding the verdict or for new trial as well as his exception to instructions 4 and 5 is that Code section 204.8(5) is the pertinent statute rather than section 204.9. It is defendant's contention he was not required to keep records regarding his purchase and sale of the narcotic preparations, Robitussin A–C and Elixir Terpin Hydrate and Codeine. It is the State's position prescriptions were not required for these items but that is the extent of the exemption regarding resale thereof.

Code section 204.1(10) under definitions states: " 'Narcotic drug' means any of the following, alone, in combination, or mixed with other ingredients:

"a. Opium, isonipecaine, cocoa leaves, or opiate.

"b. Any compound, manufacture, sale, derivative, or preparation of opium, isonipecaine, cocoa leaves, or opiate."

Code section 204.8 provides: "Preparations exempted. 1. The board may by regulation exempt from the application of this chapter to the extent it determines to be consistent with the public welfare, pharmaceutical preparations of narcotic drugs found by the board after due notice and opportunity for hearing:

"a. Either to possess no addiction-forming or addiction-sustaining liability, or to possess such slight addiction-forming or addiction-sustaining liability as to create little risk of improper use, and

"b. Not to permit recovery of a narcotic drug having such liability, with relative technical simplicity and degree of yield as to create a risk of improper use.

"2. In exercising the authority granted in subsection 1 of this section, the board, by regulation and without special findings, may grant an exempt status to such pharmaceutical preparations of narcotic drugs as are or may be determined to be exempt under the federal narcotic laws and regulations and permit the administering, dispensing, or selling of such preparations under conditions and by persons the board may prescribe.

"3. If the board shall determine that any exempt preparation does possess a degree of addiction liability that, in its opinion, results in abusive use, the board shall by regulation publish its determination. The determination shall be final and the exempt status shall cease to apply to such preparation sixty days after the publication date of the determination.

"4. Pharmaceutical preparations of narcotic drugs exempted from this chapter shall be subject to the following conditions:

"a. The preparation administered, dispensed, or sold, shall contain, in addition to the narcotic drug in it, some drug or drugs conferring upon it medicinal qualities other than those possessed by the narcotic drug alone.

"b. The preparation shall be administered, dispensed, or sold in good faith as a medicine, and not for the purpose of evading the provisions of this chapter.

"c. Only a pharmacist shall sell at retail or dispense such a preparation.

"5. Except as otherwise provided, this chapter shall not apply to the administering, dispensing, or selling of any preparation containing not more than one grain (64.8 mg.) of codeine, or any of its salts, per one fluid once (29.5729 cc.) or per one avoirdupois ounce (28.3 gms.), when such pharmaceutical preparations of narcotic drugs are administered, dispensed, or sold by persons and under conditions prescribed by the board."

It appears without dispute the board of pharmacy examiners had not adopted any exemption from the application of the provisions of chapter 204. The question presented is whether subdivision 5 of section 204.8 exempts from record keeping such narcotic preparations as described therein.

Code section 204.9 provides: "Records to be kept. Medical practitioners, manufacturers, wholesalers, pharmacies, pharmacists, hospitals, laboratories, and every person who purchases for resale or who sells narcotic drugs, shall keep such records as may be required by the board relating to receipt, manufacture, inventory, distribution, including dispensing, administering, sale, or other disposition, and information as to narcotics stolen, lost, or destroyed. In every case the record of narcotic drugs received shall show the date of receipt, the name and address of the person from whom received, and the kind and quantity of drugs received; the kind and quantity of narcotic drugs produced or removed from process of manufacture, and the date of such production or removal from proc-

ess of manufacture. The record of all narcotic drugs sold, administered, dispensed, or otherwise disposed of, shall show the date of selling, administering, or dispensing, the name and address of the person to whom, or for whose use, or the owner and species of animal for which the drugs were sold, administered, or dispensed and the kind and quantity of drugs.

"Every such record shall be kept for a period of five years from the date of the transaction recorded. The keeping of a record required by or under the federal narcotic laws containing substantially the same information as is specified by this chapter, shall constitute compliance with this section, except that every such record shall contain a detailed list of narcotic drugs lost, destroyed, or stolen, if any, the kind and quantity of such drugs, and the date of the discovery of such loss, destruction, or theft."

It is the State's position, with which the trial court agreed and so stated in instructions 4 and 5, that under section 204.9 defendant was in every case required to keep a record of narcotic drugs received, the date of receipt, the name and address of the person from whom received and of those to whom sold.

The problem presented is of first impression before this court. Similar problems have, however, been considered in other jurisdictions.

In Merritt v. State, 245 Ind. 362, 198 N. E.2d 867, defendant was charged under the Uniform Narcotic Drug Act of obtaining an "exempt" narcotic drug, paregoric containing opium, by giving a false name and address. In affirming defendant's conviction the Indiana court held the exemption ran only to purchase on prescription. At page 869 of 198 N.E.2d, the court said: "Viewing the Uniform Narcotic Act as a whole, it is obvious that it was the intent of the legislature that in certain instances it is not necessary to secure a physician's prescription to buy certain narcotic drugs

with a minimum content of opium therein specified, and that paregoric containing less than two grains of opium was within that group and could be obtained without a prescription. However, it is also apparent that even though certain drugs containing a low percentage of a narcotic might be purchased without a physician's prescription, the law still required that a record be kept of the purchases and sales and to whom made."

Continuing on page 870 of 198 N.E.2d, the court says: "In other words, a narcotic drug of a certain percentage or less may be exempt from part of the provisions of the Uniform Narcotic Act and not other provisions thereof. That, in our judgment, is the case here. The act does exempt paregoric containing two grains or less of opium from the provisions with reference to a physician's prescription, etc., but does not exempt the seller of such a drug from the requirement of keeping a record of the sales nor the buyer from the penal provision when obtaining the same by use of deceit, fraud or the use of a false name. This appears to be the construction given in other states where similar questions have arisen. State v. Lee (1963), 62 Wash.2d 228, 382 P.2d 491; State v. Sanchez (1962), 13 Utah 2d 307, 373 P.2d 695. * * *

"From reading the act as a whole, it would seem that the purpose of the act requiring the druggist to keep a record of the sales and to whom made is that an accurate record be kept in order to determine whether the exempt narcotics are being used by an addict or diverted to an unlawful use and false names and addresses being used for that purpose."

In State v. Sanchez, 13 Utah 2d 307, 373 P.2d 695, defendant was convicted of obtaining a narcotic drug, paregoric, by fraud and deceit. In affirming the conviction the court held the statute providing that it shall not apply to administering, dispensing or selling at retail of any medicinal preparation containing not more than

one grain of codeine in one fluid ounce is limited to administering, dispensing or selling at retail has no application to obtaining by fraud or deceipt, a narcotic drug.

In State v. Goodwin, 181 Neb. 616, 150 N.W.2d 135, defendant's conviction of attempting to obtain a narcotic drug, Robitussin A–C, by misrepresentation under statutory provisions very similar to our chapter 204 was affirmed.

The Nebraska court at page 136, 150 N. W.2d, states: "Robitussin A.C. is a commercial cough syrup which may be purchased without a prescription, but the transaction must be recorded. The evidence is undisputed that an ounce of syrup contained less than one grain of codeine phosphate. * * *

"Read literally or otherwise, the statutory language does not except transferees of the medicinal preparations from the penal section." (citations)

For other authority supporting the conclusion the exemption of certain drugs from prescription requirements does not bar prosecution for violation of other provisions of the narcotic statutes, see Randle v. Calif. State Bd. of Pharmacy, 240 Cal. App.2d 254, 49 Cal.Rptr. 485, 17 A.L.R.3d 1398; Baldwin v. Commonwealth, 203 Va. 570, 125 S.E.2d 858; Schenher v. State, 38 Ala.App. 573, 90 So.2d 234; People v. Bowlby, 51 Ill.App.2d 51, 201 N.E.2d 136.

Most of the authorities we have cited are reviewed in 25 A.L.R.3d 1118, section 5, pages 1127–1130. Folenius v. Eckle, 109 Ohio App. 152, 164 N.E.2d 458, and Stone v. Sacks, Ohio App., 191 N.E.2d 185, on which defendant here heavily relies, are distinguished on the basis the drug paregoric is not considered a narcotic under the provisions of the then existing Ohio statutes. It is undisputed here that Robitussin A–C and Elixir Terpin Hydrate and Codeine are narcotics under our statutory definitions.

II. Defendant strongly argues the provisions of chapter 204 regarding record keeping requirements are so vague, indefinite and open to conjecture that enforcement violates the first essential of due process.

In Lever Brothers Co. v. Erbe, 249 Iowa 454, 467, 468, 87 N.W.2d 469, 478, we quote from State v. Coppes, 247 Iowa 1057, 1061, 1062, 78 N.W.2d 10, 13, 14, these established rules: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as its meaning and differ as to its application violates the first essential of due process of law. (Citation.)

" * * * 'The legislature, * * *, must inform the citizen with reasonable precision what acts it intends to prohibit, so that he may have a certain understandable rule of conduct, and know what acts it is his duty to avoid. * * * It is axiomatic that statutes creating and defining crimes cannot be extended by intendment. Purely statutory offenses cannot be established by implication. * * *.' "

However, a statute is not so vague and uncertain as to be void where the meaning of words used can be fairly ascertained by reference to similar statutes, other judicial determinations, reference to the common law, to the dictionary, or if the words themselves have a common and generally accepted meaning. Powers v. McCullough, 258 Iowa 738, 746, 140 N.W.2d 378, 384, and citations.

Applying the foregoing principles, we must reject the contention the statute is so vague and indefinite as to violate due process.

■ III. Defendant contends here, as he did before the trial court, that section 204.8(5) takes certain narcotic drugs entirely out of the purview of the chapter. We do not agree. The plain wording of that section says only that narcotic preparations of a certain strength shall not be subject to the administering, dispensing and selling provisions of the chapter. It says nothing about any exemption from record keeping, licensing or the penalty provisions of the chapter. Record keeping is entirely separate from administering, dispensing or selling. It is unreasonable to assume the legislature in the definition of narcotics included Robitussin A–C and Elixir Terpin Hydrate and Codeine as narcotics and then by section 204.8(5) took such preparations out of all provisions contained in chapter 204.

The pertinent part of section 204.9 provides: "In *every* case the record of *narcotic drugs received* shall show the date of receipt, the name and address of the person from whom received, and the kind and quantity of drugs received * * *." (emphasis added). We are not impressed with defendant's argument that the board's failure to prescribe a particular form for keeping such a record provided him some excuse for not keeping a record.

"Every" means each one of all. 15 Words and Phrases, Perm.Ed., pages 792–794. It has substantially the same meaning as "all" which is later used in the same section. In Consolidated Freightways Corp. v. Nicholas, 258 Iowa 115, 121, 137 N.W.2d 900, 904, we say: "The word 'all' is commonly understood and usually does not admit of an exception, addition or exclusion." (citations).

The last paragraph of section 204.9 includes this: "The keeping of a record required by or under the federal narcotic laws containing substantially the same information as is specified by this chapter, shall constitute compliance with this section * * *". The plain meaning of this phrase is that section 204.9 requires records to be kept as does the federal law.

It is interesting to note defendant apparently knew and understood he was required to keep a record of his purchases and sales of Robitussin A–C as upon the request of the inspectors he without any protest or questions handed over to them some invoices and his registry book. Both the prior and present statutes require keeping of records of narcotics bought by a pharmacist. We find nothing in the legislative history of the statute to support defendant's claim he was not required to keep a record of such narcotics as Robitussin A–C or Elixir Terpin Hydrate and Codeine which are sold as a cough syrup.

We conclude the exemption provided in section 204.8(5) does not apply to the record keeping requirements of section 204.9. Defendant's assigned errors 1, 5, 6, 7 and 8 are not grounds for a reversal.

■ IV. Defendant's assigned errors 2 and 3 are based on claimed lack of qualifications of the witness Raaz to conduct the audit or accountability survey. Defendant argues vigorously because Raaz had not attended an accountability survey school sponsored by the federal government until after completion of the audit he was not qualified to make the audit or prepare exhibit 1, the audit report which became a part of the records of the pharmacy board. Assigned errors 2 and 3 are without merit. Raaz testified he had worked with Wheeler and other registered pharmacists and had attended many in-office critiques or instructions regarding the two items being audited and that the audit or survey was done by reviewing the invoices and registry produced by defendant and counting his stock on hand. The audit or survey consisted of simple mathematical calculations and setting out the results thereof in a report to the board. Attendance of a federally sponsored accountability school would not be required to carry out such an audit or survey.

V. Cross-examination of Paul Crews, secretary of the pharmacy board, by defendant's counsel includes:

"Q. We have Robitussin, which is a Class 'X' exempt, right, for prescription? A. That is correct.

"Q. And you are telling me it has sixteen times more in it than a regular dosage of codeine? A. Your comparison here is not quite a fair one.

"Q. Well, that's what I was thinking. That's the comparison you made. A. For the reason you are referring to a single dose of codeine by itself, and this particular formulation has four grains of codeine in that four ounce bottle.

"Q. Mixed with other— A. Mixed with other medicinals, right.

"Q. That's why it's Class 'X', and a prescription isn't required, isn't that right? A. It is exempt from the prescription requirement only. It is not exempt from any of the other requirements.

"Q. But it says it is a Class 'X' exempt drug, doesn't it? A. Meaning exempt from the prescription requirement."

Crews' redirect examination includes:

"Q. Mr. Crews, Class 'X', that classification is a federal classification? A. That is correct.

"Q. And the term exempt, which is on the Robitussin A–C, means exempt from prescription requirements? A. That is correct.

"Q. Does that also mean exempt from record keeping under the Iowa rule?

"Mr. Rockwell: Objected to as calling for an opinion and conclusion of the witness, and for the further reason it is leading.

"The Court: He may answer, if he knows the answer.

"A. All other record keeping requirements must be maintained as to the receipt of the drug at the time of purchase, and at the time of the sale of the drug."

■ Defendant asserts the trial court erred "in permitting State's witness, Paul Crews, to testify as to the law". The obvious answer to this contention is that defendant first on cross-examination inquired about the applicable law and thereby opened the door for further such inquiry on redirect. The trial court's ruling was correct.

58 Am.Jur., Witnesses, section 562, page 315, states: "A party may not complain of incompetent evidence brought out on redirect examination of a witness, to explain incompetent testimony elicited on cross-examination. Similar statements of the general rule are found in 98 C.J.S. Witnesses § 419b.

Hofacre v. Monticello, 128 Iowa 239, 245, 103 N.W. 488, 490, states: The matter was brought out on cross-examination and plaintiff had the right to re-examine him with respect thereto. The question, no doubt, called for an opinion or conclusion of the witness, or rather for a comparison by him; but in view of the nature of the cross-examination and of the answer given by the witness we are not inclined to interfere with the discretion of the trial court in such matters." We have consistently recognized this rule. Castner v. Wright, 256 Iowa 638, 647, 127 N.W.2d 583, 588, 128 N.W.2d 885; State v. Finnegan, 244 Iowa 166, 172, 55 N.W.2d 223, 226; Glatstein v. Grund, 243 Iowa 541, 549, 51 N. W.2d 162, 168, 36 A.L.R.2d 531; State v. Rohn, 140 Iowa 640, 646, 119 N.W. 88, 91.

■ VI. Defendant's remaining assigned error is "The court erred in imposing the sentence which it imposed upon this defendant". He argues he was sentenced pursuant to section 204.20(4) which provides: "For violation of the provisions of this chapter concerning the manufacturing, selling, administering to another person, or dispensing a narcotic drug, the imposition or execution of sentence shall not be suspended and probation or parole shall

not be granted until the minimum imprisonment herein provided for the offense shall have been served."

The record discloses defendant was sentenced on the verdict finding him guilty of failure to keep records in violation of section 204.9 and pursuant to section 204.20(1) which provides: "Any person violating any provision of this chapter, except as otherwise provided shall upon conviction be fined not more than two thousand dollars and shall be imprisoned in the state penitentiary not less than two or more than five years. \* \* \*." We find nothing in the record indicating the trial court felt obliged to follow section 204.-20(4).

■ Defendant does not specifically argue the penalty imposed is too severe but this must be inferred from his contention that section 204.20(4) was followed by the trial court. It is our duty to carefully consider whether the punishment imposed is too severe. Code section 793.18. We have, however, consistently held that where the judgment imposed does not exceed the statutory maximum, it is only where an abuse of the trial court's discretion in fixing punishment is shown that we will interfere. State v. DeRaad, Iowa, 164 N.W.2d 108, 112; State v. Cupples, 260 Iowa 1192, 1197, 152 N.W.2d 277, 280; State v. Kulish, 260 Iowa 138, 145, 148 N.W.2d 428, 433.

■ The punishment imposed here is within the maximum under section 204.-20(1). We must presume the trial court took all the facts developed in the course of the trial and the entire picture presented into consideration in fixing the sentence. State v. Kramer, 252 Iowa 916, 921, 922, 109 N.W.2d 18, 21. We find no abuse of the court's discretion.

Finding no reversible error, the judgment of the trial court is—Affirmed.

All Justices concur except RAWLINGS, J., who takes no part.